DAVIS, Circuit Judge,
dissenting:
The majority holds that § 1.1 of the parties’ Interim Servicing Agreement *41 (“ISA”) constitutes a liquidated damages clause, and that the payment Freddie Mac agreed to make pursuant to that clause is an unenforceable penalty. My examination of the record persuades me, however, that Freddie Mac could satisfy its obligations under the ISA with any of several alternative means of performance. Accordingly, when viewed in light of the full scope of the parties’ interests and incentives, § 1.1 is enforceable. Because § 1.1 is enforceable and because (as the district court concluded) there exists a genuine dispute as to whether Freddie Mac “determine[d] and communicate[d]” to Doral that Doral would be servicing the portfolio, I would vacate the judgment and remand the case for a trial on that question. Respectfully, therefore, I dissent.
I.
I begin by briefly describing the context in which the parties entered negotiations with each other. Sometime prior to 2008, Freddie Mac contracted with R & G Financial Mortgage Corporation (together with affiliated entities, “R & G”) to service approximately 46,000 mortgage loans with a face value of $3.8 billion, secured by property located mostly in Puerto Rico. Pursuant to that agreement, R & G agreed to assume what is known as the portfolio’s “recourse obligation”: in the event any of the loans in the portfolio were to default (or if some other “triggering event” were to occur), R & G would absorb the loss by repurchasing the delinquent loans and repaying Freddie Mac the associated value. In 2008, Freddie Mac itself calculated the value of the recourse obligation as $106 million; at any given time the entity assuming the recourse obligation carried an estimated liability of $106 million on its books. R & G’s compensation for servicing the portfolio’s loans and bearing the recourse obligation was set at a percentage of the borrower’s monthly interest payments.
In mid-2008, with the nationwide mortgage crisis coming to a head, R & G faced serious financial difficulties. Freddie Mac, as the owner of the debt, worried that an R & G collapse would create two problems: (1) the portfolio would be left without a servicer and (2) the $106 million recourse obligation would revert to Freddie Mac. To ensure continuity in the servicing of the portfolio and prevent the recourse obligation from reverting to Freddie Mac, Freddie Mac began working to terminate R & G as servicer of the portfolio and to find another qualified servicer. One of the banks Freddie Mac approached to take R & G’s place was Doral, a large bank with numerous branches in Puerto Rico.
Doral found the opportunity worth pursuing: as servicer, it would not only collect servicing fees but also would have substantial “cross-selling” opportunities, i.e., opportunities to sell other banking services to the huge number of new customers who would pass through Doral’s bank branches to make their monthly payments. (Apparently, borrowers in Puerto Rico customarily make mortgage payments in person at banks, at least at rates substantially higher than in the mainland U.S.) Doral was concerned, however, that an increasing number of loans in the portfolio would default, and so recourse loomed as a particularly unsavory risk. Doral determined that the risk of assuming the recourse obligation would only be worthwhile if Freddie Mac would allow Doral to collect a greater percentage of the portfolio’s revenue than apparently is typical.
Freddie Mac thought the premium Doral demanded was too high, but it desperately needed a servicer, and Doral — a large financial institution with a substantial presence in Puerto Rico and over ten years of experience servicing Freddie Mac *42 mortgages — fit the bill. Thus, the parties agreed that Doral would be an “interim” servicer: it would service the loans but would not carry the recourse obligation. The recourse obligation, meanwhile, would revert to Freddie Mac. But Freddie Mac was also wary of the risk that more and more borrowers would default, forcing Freddie Mac to swallow losses potentially over $100 million. Thus, Freddie Mac, in exchange for allowing Doral to forgo the recourse obligation, demanded the ability to transfer the portfolio to a “permanent” servicer, i.e., one willing to accept the recourse obligation, at any time, so long as it gave Doral 30 days’ notice.
Doral was willing to accept Freddie Mac’s condition, but not without imposing its own condition. Freddie Mac was asking Doral to rapidly ramp up its operations to service a huge number of loans, all in a matter of days. Doral was incurring far too many up-front costs to give Freddie Mac carte blanche to terminate the ISA at will. If Freddie Mac were to terminate the ISA quickly, Doral’s up-front expenditures would be for naught. As Doral’s General Counsel explained, Doral “did not want to be a stopgap,” allowing Freddie Mac to “shop around the portfolio” while Doral did “all the setup,” only to have to “fire a lot of people” once Freddie Mac found a permanent servicer. J.A. 376. An early termination by Freddie Mac would also prevent Doral from “cross-selling” its other banking services — a benefit that was crucial to making the ISA worthwhile for Doral in the first place.
Thus, the parties’ risk-allocation calculus came down to the following: Freddie Mac wanted to retain the right to transfer the portfolio to a permanent servicer as soon as possible, in order to minimize the time during which it would carry the recourse obligation. Accordingly, it proposed a month-to-month arrangement. Doral wanted to service the portfolio as long as possible in order to maximize its servicing fees and cross-selling opportunities. The question was how long Doral would need to service the portfolio in order to make entering the ISA economically worthwhile.
Doral instructed its then-Senior Vice President of Investor Relations, Roberto Reyna, to create a model projecting revenue and expenses associated with servicing the portfolio. Reyna determined that only with a guaranteed two-year servicing term would Freddie Mac’s proposal be economically advantageous to Doral. Doral saw the two-year term as an essential, nonnegotiable requirement of entering the ISA. A two-year deal would give Doral time to recoup the costs it would expend to service the loan, and, perhaps even more important, give it sufficient time to cross-sell its other banking services and thereby potentially make a profit. Doral estimated that over the course of the 24-month interim servicing term it would receive $10,876,954 in service compensation fees. It does not appear to have estimated the revenue it would generate from cross-selling to the portfolio’s borrowers.
The compromise the parties reached was memorialized in § 1.1. Doral agreed to service the portfolio, and be compensated with a per-month, per-mortgage fee, “until such time as Freddie Mac determines to transfer servicing” to a permanent servi-cer. J.A. 30, 45. The parties also agreed that, unless (a) “the Interim Portfolio is transferred pursuant to a court order,” or (b) Doral’s eligibility to sell or service mortgages were suspended or terminated, “the length of the interim servicing will not be less than 24 months.” J.A. 30. In the crucial term at issue, which I will call the “early transfer provision,” Freddie Mac agreed that, “[i]f the length of interim servicing is less than 24 months, then Freddie Mac will pay to Interim Servicer *43 the total of 24 months of servicing compensation fee minus the number of months already billed by Interim Servicer.” Id.
This carefully negotiated early-transfer provision struck a compromise between Doral’s and Freddie Mac’s concerns: it allowed Freddie Mac the flexibility to transfer the portfolio, at any time, to a permanent servicer (and thereby take the $106 million recourse obligation liability off its books), while ensuring that Doral would either (1) have 24 months to service the loans, collect servicing fees, and cross-sell other banking services, or (2) lose the cross-selling opportunities but still collect the servicing fees it would have received.
None of the early-transfer language would be relevant, however, if the ISA never went into effect. According to § 2.6, the “Effective Date” for “commencement of the servicing of the Mortgages” was agreed to be the following:
a date that Freddie Mac determines and communicates to the Interim Servicer that Interim Servicer will be servicing the Interim Portfolio. The Effective Date, when possible, will correspond to a date when Interim Servicer obtains the files for the Mortgages.
J.A. 38 (emphases added). Once the requisite “determin[ation] and communi-catfion]” were made, Doral’s obligation to service the loans would commence, along with its right to collect servicing fees.
II.
The primary question in this appeal is whether § 1.1 of the ISA is (1) an alternative-performance provision, (2) an enforceable liquidated damages clause, or (3) an unenforceable penalty. In holding that § 1.1 is an unenforceable penalty, the majority, in my view, oversteps its role and undermines a carefully negotiated compromise among sophisticated parties. I would hold that § 1.1 is enforceable as an alternative-performance provision. The second question presented, which the majority does not reach (and as to which Freddie Mac has not filed a cross-appeal), is whether a reasonable jury could find that Freddie Mac “determine[d] and communi-eate[d]” to Doral that Doral “will be servicing the Interim Portfolio.”
A.
The first component of whether § 1.1 is enforceable is whether it is an alternative-performance clause or a liquidated damages clause. An alternative-performance provision is one in which “either one of the two alternative performances is to be given by the promisor and received by the prom-isee as the agreed exchange.” 11-58 Cor-bin on Contracts § 58:18. A liquidated damages clause is one that fixes an amount of damages to be paid in the event of “breach.” Restatement (Second) of Contracts § 356 (1981). If ISA § 1.1 is an alternative performance provision, it is enforceable according to its terms. 24 Richard A. Lord, Williston on Contracts § 65:7 (4th ed.2002). If it is a liquidated damages provision, it still is enforceable, but only if the liquidated amount is “reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss.” Restatement (Second) of Contracts § 356.
To determine whether a contract provides for alternative performances or liquidated damages, we look to “the substance of the agreement.” Id. § 356, cmt. c. As the majority correctly notes, one distinction between alternative performances and liquidated damages is whether the provision “looks to a continuation of the relationship between the parties, rather than its termination,” or instead serves as a stipulated calculation of damages by the parties “as a remedy for breach.” Willi-ston § 65:7 (emphasis added); see also 11- *44 58 Joseph M. Perillo eel., Corbin on Contracts § 58.1 (a liquidated damages provision “determine^] in advance what damages will be assessed in the event of a breach”). In addition, crucial factors in assessing the distinction between these two types of contractual provisions include “[1] whether the promisor had a ‘true option’ on which alternative to perform, [2] whether the money payment is equivalent to performance of the option, and [8] the relative values of the performances.” 14 Williston on Contracts § 42:10; see also Restatement (Second) of Contracts § 356 cmt. c (“In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive”). For a contractual provision to be one for alternative performance, at the time the parties entered the contract there must have been “a reasonable relationship between the alternatives.” 14 Williston on Contracts § 42:10. That is, the promisor must have “conceived [it to be] possible that at the time fixed for performance, either alternative might prove the more desirable.” Id.
The fact that “one of the alternative performances is the payment of a liquidated sum of money” does not necessarily transform an alternative-performance clause into a liquidated damages clause. 11-58 Corbin on Contracts § 58:18; see also 24 Williston on Contracts § 65:7, at 263 (The fact that “one of the alternative performances is the payment of a fixed sum of money” does not “alone ... make the contract one for single performance with a liquidated damage provision for a breach.”). Indeed, “most instances of alternative contracts involve the payment of money as an alternative to actual conduct in carrying out the terms of an agreement.” Matter of Cmty. Med. Ctr., 623 F.2d 864, 867 (3d Cir.1980). An alternative performance provision will not be enforced, however, if it is a “disguised” penalty. Restatement (Second) of Contracts § 356 cmt. c.
B.
Doral argues § 1.1 is a proper alternative-performance clause because it allowed Freddie Mac to perform its obligations under the ISA in either of two ways: (1) keeping the portfolio with Doral for the entire 24-month period, at the cost of having to bear the potential $106 million default risk for the entire 24 months, while compensating Doral with monthly servicing fees, or (2) transferring the portfolio to a permanent servicer at some point during the 24 months, relieving Freddie Mac of the $106 million default risk, and compensating Doral with the equivalent of the servicing fees Doral would have earned during the remainder of the 24 months. I agree. In my view, Freddie Mac had a true option on which alternative to perform, as the values of the two options were reasonably equivalent and either option could have proven to be the more desirable one depending on extrinsic factors.[11]
*45 There is no dispute that if Freddie Mac were to transfer the portfolio early (i.e., if it chose the second option), it would end up spending more money on the servicing of the portfolio than it would have otherwise. For example, if it were to transfer after 10 months, it would still owe Doral 14 months’ worth of servicing fees but would also have to pay 14 months of servicing fees to the new permanent servicer. But, crucially, an early transfer would not necessarily be more expensive to Freddie Mac when one considers, as one should, the $106 million recourse obligation. Every month the recourse obligation remained on Freddie Mac’s books, the company faced the risk that borrowers with many millions of dollars in loans would default, and Freddie Mac would bear the full brunt of those losses. This risk was palpable in mid-2008, just as the proverbial housing bubble was beginning to burst. At any given time during Doral’s 24-month interim servicing term, Freddie Mac could rationally have decided that invoking the early transfer clause in § 1.1 would be in its best interests, even if doing so would mean essentially paying double servicing fees during the remainder of the 24 months.
When viewed in these terms, I conclude that Freddie Mac had a “true option” to elect either to leave the portfolio with Doral for the full 24 months or to transfer it to a permanent servicer earlier. When one compares “the relative values of the performances,” it is clear that the “money payment” pursuant to § 1.1 (the value of remaining servicing fees) is reasonably equivalent to “performance of the option” (leaving the portfolio with Doral while retaining the recourse obligation), precisely because it was in Freddie Mac’s interest to unload the recourse obligation as soon as possible.
The majority places apparently disposi-tive weight on three facts: (1) that the early-transfer payment turned out to be 87.8 times larger than what the majority sees as Doral’s “actual damages,” i.e., the money Doral expended to prepare to service the 46,000 loans in the portfolio; (2) that the early transfer payment was to be the full amount Freddie Mac would have paid Doral in servicing fees, with no deduction for the expenses Doral would have incurred if it had continued to service the loans (and would save if Freddie Mac were to transfer the portfolio early); and (3) that § 1.1 “would apply only if Freddie Mac were to terminate the ISA” by transferring the portfolio to a permanent servi-cer, thereby ending the parties’ contractual relationship. Maj. Op. at 38-89. But these facts do not render § 1.1 unenforceable, for the following reasons.
First, the ratio between the expenses Doral incurred in preparing to service the portfolio and the servicing fees it would *46 have collected over the 24 months is not relevant to whether Freddie Mac had a true option between two plausibly beneficial options. It is true $10.9 million is much larger than the $124,588 Doral actually expended. But when Freddie Mac arguably transferred the portfolio back to R & G (“arguably” because there is a genuine dispute whether Freddie Mac determined and communicated that Doral would be servicing the portfolio, see infra), Freddie Mac benefited by avoiding any more time carrying the $106 million recourse obligation. The question whether § 1.1 provides for alternative performances is assessed from Freddie Mac’s perspective, because Freddie Mac was the “promisor” with respect to the early transfer payment. See 14 Williston on Contracts § 42:10 (looking to whether “the promisor had a ‘true option’ on which alternative to perform”); 11-58 Corbin on Contracts § 58:18 (describing an alternative-performance contract as one in which “either one of the two alternative performances is to be given by the promisor and received by the promisee as the agreed exchange”). The amount Doral expended on preparations is immaterial to the relative attractiveness to Freddie Mac, the promisor, of the two alternative ways it could discharge its obligations under the ISA.
Second, even if the relative benefit of the options to Doral were relevant, Doral would not necessarily have been better off with an early transfer. .While an early transfer would allow Doral to collect its servicing fees without incurring expenses from actually servicing the portfolio, an early transfer would also have stripped Doral of the potentially very significant cross-selling opportunities it would have had during the remainder of the 24 months. Freddie Mac does not dispute that a substantial portion of the borrowers in the portfolio were not existing Doral customers, and that Doral’s new cross-selling opportunities would have led to new business for Doral. Indeed, the influx of new customers would have increased Doral’s mortgage servicing business by nearly one-third. Thus, to the extent the majority insists on considering the relative benefit of the options to Doral, the relevant comparison is not between the $124,588 in preparation expenses and the $10.9 million early-transfer payment. Rather, it is between (1) the expenses Doral would have incurred during a particular portion of the 24 months, and (2) the revenue Doral would have received from cross-selling during those months. There is every reason to believe the parties saw the value of these two items as roughly equivalent. Therefore, viewed not only from Freddie Mac’s perspective but from Doral’s as well, Freddie Mac’s two alternative means of performance were reasonably equivalent.
Third, the ISA expressly grants Freddie Mac the option to transfer the portfolio to a permanent servicer within the 24 months. A liquidated damages clause stipulates damages in the event of a “breach” by one of the parties. Restatement (Second) of Contracts § 356. Because the ISA expressly allows Freddie Mac to transfer the portfolio early, an early transfer would not constitute a breach. This is so even though, as the majority notes, Freddie Mac’s invocation of its early-transfer option would essentially terminate “the relationship between the parties.” Maj. Op. at 38 (quoting Williston § 65:7). While the continuation of a contractual relationship can help demonstrate that a particular performance is a true alternative rather than liquidated damages, see, e.g., Cmty. Med. Ctr., 623 F.2d at 865,[12] such a continuation is not necessary. See, e.g., River East Plaza, LLC v. Variable Annuity Life Ins. *47 Co., 498 F.3d 718, 724 (7th Cir.2007) (interpreting a contract as one for alternative performance even though the promisor’s election of one option effectively terminated the parties’ contractual relationship)[13]; Las Vegas Sands Corp. v. Ace Gaming, LLC, 713 F.Supp.2d 427 (D.N.J.2010) (upholding as an alternative-performance contract a trademark-licensing agreement that provided for the contract to continue until the year 2086, but permitted early termination with the condition that the terminating party would nevertheless pay the licensing fees due until the 14th anniversary of the contract plus an additional one-year “termination fee”).
For these reasons, I would hold that § 1.1 is a true alternative-performance provision that must be enforced if the condition precedent (the determination and communication from Freddie Mac) occurred.[14]
C.
Because I would hold that the early-transfer provision in § 1.1 is enforceable, I *48 simply highlight the district court’s treatment of the issue of whether the parties’ obligations under the ISA became effective. The district court concluded, correctly in my view, that there was a genuine dispute on this issue.[15] Manifestly, a reasonable jury could reasonably find that Freddie Mac “determine[d] and communi-eate[d]” to Doral that Doral would “be servicing the Interim Portfolio.” Accordingly, I would remand this case for trial.
As the majority explains, on Friday, July 11, 2008, Freddie Mac instructed Doral to come to the R & G offices to facilitate transfer of loan files to Doral on the following Monday. That same day, a Freddie Mac team arrived in Puerto Rico intending to terminate R & G’s eligibility to sell loans to, and service loans for, Freddie Mac. Freddie Mac also instructed Doral’s Vice President of Mortgage Servicing to prepare for the transfer of certain physical mortgage files from R & G and to have personnel, information technology support, and transportation support ready by Monday morning. Over the weekend (July 12-13), Freddie Mac’s representatives in Puerto Rico worked together with Doral staff at Doral’s headquarters to set in place the necessary elements of servicing. Freddie Mac provided Doral with electronic files containing information about the loans in the Interim Portfolio, including detailed personal and financial information about the mortgage borrowers. Furthermore, Freddie Mac’s representative told Doral on Saturday, July 12, that Freddie Mac anticipated obtaining the R & G files in three calendar days.
On the morning of July 14, representatives of the two companies met at Doral’s offices in San Juan to discuss, as Freddie Mac characterized it, the “anticipated initiation of the transfer of R & G’s files (including data) to Doral.” J.A. 143. In addition, Freddie Mac provided Doral with an electronic copy of the “trial balance data,” the loan data for the 46,132 Freddie Mac mortgage loans then constituting the Interim Portfolio. J.A. 208, 1848-59. According to Doral, upon receiving this data, together with the loan data received over the weekend, Doral had all the information it needed to begin servicing the portfolio by sending welcome letters to borrowers, accepting loan payments, performing reconciliations, and making remittances to Freddie Mac. Furthermore, Freddie Mac’s internal documents, created prior to the evening of July 15, indicate that Freddie Mac had “already assigned the servicing” to Doral and refer to Doral as “the Interim Servicer.” J.A. 275-78, 534-36.
Based on this evidence, a reasonable jury could conclude that Freddie Mae had “determine[d]” to transfer the servicing rights to Doral, and had effectively “communicated” that determination to Doral. Only after the temporary restraining order enjoined Freddie Mac from transferring the portfolio to Doral did Freddie Mac show any intention other than that Doral imminently would become the interim ser-vicer, and should make every effort to prepare to begin servicing the portfolio.
III.
For these reasons, I would vacate the grant of summary judgment to Freddie Mac and remand this action for trial.

. The majority declines to explain why it believes Freddie Mac did not have a true choice between two plausibly desirable options. Instead, my good colleagues apparently believe that, assuming § 1.1 is enforceable, the express exception in § 1.1, which would apply if Freddie Mac had been "ordered by court to transfer the Interim Portfolio from the Interim Servicer before the expiration of 24 months," J.A. 30, excused Freddie Mac from making the early-transfer payment. The majority asserts that "of course” the Puerto Rico court’s temporary restraining order constitutes such a court order. Maj. Op. at 38 n. 5. But Freddie Mac does not argue on appeal that the "ordered-by-court” exception excused its performance under § 1.1. Rather, its argument related to § 1.1 is entirely and solely that (1) § 1.1 does not apply because there was no "determin[ation]” and "communication]” under § 2.6, or, alternatively, (2) § 1.1 is unenforceable. Moreover, although *45 Freddie Mac raised in the district court the argument now relied on by the majority, the district court easily (and correctly, in my view) rejected it:
While Freddie Mac admits that no such court order to transfer the loan portfolio was ever issued because R & G never transferred the files to Doral in the first place, Freddie Mac contends the TRO should be considered the same as a court order transferring the files away from Doral. This argument fails as a matter of law.... [A]s Freddie Mac concedes, the TRO did not transfer the portfolio from Doral. This Court will not assume that the TRO is the same as an order transferring the portfolio for the purposes of Section 1.1. In this regard, it is impossible to determine what the district court issuing the TRO would have done had the portfolio, in fact, already been transferred to Doral.
Doral Bank PR v. Federal Home Loan Mortgage Corp., 2010 WL 3984667, *5 (E.D.Va. Oct. 7, 2010) (emphasis added). Therefore, the majority's reliance on the “ordered-by-court” exception to avoid the requisite economic analysis is misplaced.

. In Community Medical Center, the contract at issue was for the provision of information *47 technology services to the Center. 623 F.2d at 865. The Center agreed to either (a) pay InfoMed, the IT company, on a monthly basis for the services it provided, which were around $3,400 on average, or (b) pay a minimum monthly fee of $1,500. Id. at 866. The Third Circuit held that the $1,500 minimum monthly fee was a true alternative performance, in part because the fee "look[ed] more to a continuance of the relationship between Info Med and the debtor rather than termination.” Id. at 867. The court'did not, however, indicate that the continuance of the relationship was a necessary condition to finding the contract to be one for alternative performances.

. In River East, a development company (River East), took out a $12 million loan to build a large retail store. 498 F.3d at 719. The loan agreement included a "yield maintenance prepayment clause,” which provided that, in the event River East chose to pre-pay the loan, it would have to pay back not only the principal but also the return the lender would have received if it had invested the remaining balance in Treasuries over the remaining years on the loan. Id. River East pre-paid and tried to avoid paying the prepayment amount, calling it an unenforceable "penalty.” The Seventh Circuit rejected that argument, and conducted a detailed analysis of the "relative value of the alternatives” from the perspective of the parties at the time they negotiated the loan agreement. Id. at 722-23 (applying Restatement (Second) of Contracts § 356). Because River East could achieve a substantial benefit by pre-paying, even though it would also have to pay the pre-payment penalty, the court concluded that River East had a true choice between two options; the eventual relative value of the two alternatives (and thereby River East’s eventual decision whether to refinance) would depend entirely on whether interest rates increased or decreased. The clause was not one whose "sole purpose is to secure performance of the contract.” Id. at 723. Therefore, the alternative-performance clause was enforceable according to its terms, notwithstanding the fact that it operated to terminate the parties’ relationship.

. In the alternative, even if § 1.1 is analyzed as a liquidated damages clause, it would be enforceable for largely the same reasons. Under federal common law, a liquidated damages provision is enforceable if, at the time of contracting, (1) "the harm that would be caused by a breach is difficult to estimate” and (2) the liquidated amount is "a reasonable forecast of the loss that may be caused by the breach.” DJ Mfg. Corp. v. United States, 86 F.3d 1130, 1133 (Fed.Cir.1996); see also O'Brian v. Langley School, 256 Va. 547, 507 S.E.2d 363, 365 (1998) (applying the same test under Virginia law). As discussed, one aspect of the harm to Doral of an early transfer was the loss of cross-selling opportunities, the precise value of which was very difficult to calculate. Moreover, the early-transfer payment was a reasonable forecast of the value of those opportunities. Although § 1.1 does not deduct the amount Doral would have expended over the remaining months, it is reasonable to conclude that the parties considered Doral’s servicing expenses as roughly equivalent to the value of Doral’s cross-selling opportunities. Therefore, in my view, even construed as a liquidated damages clause, § 1.1 is enforceable.

. I agree with the majority that the “Effective Date” described in § 2.6 is distinct from the effective date clause on the face of the ISA.